We'll move to our last one, which will probably feel a bit like Groundhog Day, Rococo Steak v. Aspen Specialty. Good morning, may it please? Hold on, Mr. Burns. I want to make sure we've got everybody. Well, okay, we have Ms. Sykes, so I guess we do. Okay, thank you. You may begin. Good morning, may it please the court? I'm Timothy Burns, and I represent Appellant Rococo Steak. It does feel, I'm sure will feel a bit like Groundhog Day, probably a very dark version of Groundhog Day from my perspective. I've listened to the questions carefully, and I know heavy lift I have before this panel, the same heavy lift that we've had before a number of courts here. So I'd like to do this. I'm going to spend about six or seven minutes taking a step back and focus on the case law as a whole on COVID-19 business interruption coverage and why the courts are taking us down the wrong path. And then I want to come back to the very good questions this court asked to my colleagues on the policyholders side. But let me start with the wrong path issue. The great legal scholar, legal realist scholar, DC Circuit Judge and lawyer Thurman Arnold told us 90 years ago that the value of the law is to allow change while wrapping that change in the comforting, however false, notion of consistency to internal principles. And that's what's happening in these COVID-19 cases. The courts profess adherence to a broad principle of insurance law, the ordinary language rule, while changing that rule. And I'm not saying that there's anything wrong with that as a matter of common law, but let's recognize what's happening. The ordinary language rule was established as a consumer protection rule. Courts in the 1950s and 1960s recognized that insurance contracts were adhesive. So they protected consumers by saying, don't purport to confer coverage and then undermine that brand of coverage with a bunch of mumbo jumbo. If you want to exclude something or limit something, say it clearly such that an ordinary person can understand what you're doing. Yeah, but that's not the ordinary meaning rule. Ordinary meaning rule is far more ancient and far more pervasive that it applies to the interpretation of all legal text. It would apply to a statute. It would apply to a contract. It would apply to a deed, a trust, any kind of written instrument, whether it's private law, public law. And that is that we read the term based on its ordinary meaning, unless its context suggests that it bears some kind of technical or legal meaning. And that rule is not a consumer protection rule. That's just a rule of interpretation that cuts across all fields of interpretation of text. Your Honor, I would respectfully disagree in the insurance law context. And I would point the court. There are certainly rules in the insurance context that contra preferentum, certain rules that to the extent that there's ambiguity, you construe it in favor of the insured because the insured is not in the position to avoid the ambiguity. The contracts are written by the insurance companies. They're not the sort of things that are negotiated. But that's not the same thing as the ordinary meaning. Your Honor, I would respectfully disagree in the insurance context. I point the court to Professor Judge Keaton's monumental argument in his article. I do it advisedly recognizing that like my brother was editor in chief of the Tulane Law Review, Judge Breyer. But it's the Harvard Law Review, 83 HLR, Issue 5, 961 to 985. And he goes through the reason behind the ordinary person rules. So I would submit that I respectfully disagree. Ordinary person, though, is different from ordinary meaning. I certainly understand the point that you, in many contexts, have to consider how the ordinary consumer reads certain things. But that's different from an ordinary meaning. That's my point, Mr. Burns. Understood, Your Honor. But I would submit Florida's law is very clear. And I think we cited cases to the effect in our papers that insurance contracts are interpreted according to the meaning that an ordinary person would give them. And I would submit that's a consumer protection role. And part of the role in the insurance context, Your Honor, is that it's not sufficient that a sophisticated underwriter or a sophisticated judge understands what you're doing. The ordinary person has to understand what you're doing. Moreover, it comes that limitations on coverage aren't buried in the fine print. And I want to talk a bit about how the case law actually goes against this consumer protection principle of recognizing that. And to be fair to the court, I want to... Before you do that, Mr. Burns, let me ask you, are you relying on the aspect of the policy that deals with physical loss or physical damage? Physical loss, Your Honor. So physical damage is not an issue in your case? It's certainly our property. We've both suffered a loss and damage by the presence of COVID-19. Do you think that the word physical modifies the word damage or only the word loss? I think it modifies both. You have a tough, in my personal opinion, you've got a really tough road on physical damage then. Because if something is damaged physically, you expect, at least it seems to me, some alteration of the end of the thing, right? Physical loss is a different argument, but it seems to me that you've got a really tough road. Your Honor, Judge Jordan, I would agree that damage appears tougher than loss, but I would submit that when you ask an ordinary person what damage is, they'll tell you that it's injury. And there's been injury here. But let me go to physical loss here. But I grew up next door to Judge Pryor's estate in Mississippi. I was obstinate and defiant as a child. And I've known since I was five years old what direct physical loss is. Because when my obstinance bled into defiance, I would hear my mother say, Timmy, you've lost your toys. Now, my mother wasn't talking about taking a sledgehammer to my toys. Did your mom say that you had physically lost your toys? Well, it was physical. I couldn't touch them, Your Honor. I could stare at them, but I couldn't touch them and use them in the way that I wanted to use them. It was direct also because she didn't waste any time in doing so. It was a direct physical loss. It didn't require a hammer to my toys. And it didn't require permanent dispossession, as many courts suggest here. It was a direct physical loss. I want to just say a word about Judge Pryor. You mentioned the repair, rebuild argument. Looking to another part of the policy, I would submit Judge Chain's decision in the note that hammer and nail type repair, one repair might be thought of as expanding the business. Another might be thought of as some property can't be repaired. The property here, it seems to me, at worst, just has to be clean. Pardon? It seems to me, at worst, the property involved in all these cases just has to be clean. But Judge, I would agree that the property needs to be cleaned and disinfected and everything else, but it can't be appropriately clean with people coming in over and over again and continuing to infest and infect the property. That's the situation we have before us. We don't have road dust like in Mama Jo's. We have something that causes a loss of functionality to the property. I want to go to Judge Anderson's. Does that mean that these policies are going to be covering businesses that choose to close during flu season? Your Honor, I think that the insurance industries... If you bring people in and the flu virus is going to get on everything or the common cold, you're going to have contamination issues any time any kind of virus or similar sickness is circulating. But it has to result in a suspension and a loss of business income. And of course, part of the insurers are further protected by the principle de minimis non cura lex. We're not talking a common flu, a common cold. We're talking something that actually shut down millions of American businesses. And what shut them down were governments telling them they couldn't operate? Well, it's both, Your Honor. I have the benefit of serving many clients here, some closed because of government orders, some closed because they knew they weren't keeping their customers safe. I'm sorry that I exceeded my time. No, that's okay. You were responding to me. Ms. Seitz? May it please the court, Virginia Seitz again for Apelli Aspen. And for the reasons described by Apelli's in the consolidated cases just heard, the district court here correctly held that Rococo failed to plead facts establishing direct physical loss of or damage to property. As this court held in Mama Jo's under Florida law, direct physical loss or damage requires an actual change to the covered property that must be tangible. On Gilraeth and Ascent Hospitality, this court reached the same conclusion under the law of two other states, as have seven of your sister courts of appeals under interpreting nearly identical policy language. The principles of state to state, they have all led to the same conclusion, namely that income losses resulting from government limits on the use of property are not caused by physical loss of or damage to property. It is significant also that many federal district courts and state courts applying Florida law to claim seeking this kind of coverage have reached the same conclusion. We think Mama Jo's got Florida law right. The Florida cases of Azalea and Mass Ponds and Widers and Marquez and Peak all involve tangible or actual changes to ensure property that results in a covered loss. What was the change in Mass Ponds? It was just a malfunctioning pipe. Respectfully, no, I don't think so, your honor. The sinkhole or erosion was determined to have a displacement or an alteration in the pipe's position that caused the sewage then to flow a different direction into the house instead of out from the house. So we think in each of these cases there's a tangible alteration in the property that results in the damage that's caused. It's important too that here, unlike in those cases, there's additional policy language supporting this narrow interpretation. The policy coverage lasts only until rebuilding, repaired, or replaced with reasonable speed and of a similar quality. I understood that there were two holes in the line in Mass Ponds and it was actually physically broken, is that right? That's my understanding as well, your honor. Mass Ponds and Widers are the two pipe cases. In one case the pipe is moved and displaced, in the other case the pipe is corroded and broken. In either instance there's a physical alteration in the property that forms the basis of the coverage decision. The other critical part of this policy, of course, is there's also an express exclusion for loss of use that's combined. The restoration provision with the loss of use exclusion with the relevant policy language and then you consider the policy as a whole, which is what Florida law requires. We think the requirement of actual or tangible alteration of the covered property is a prerequisite to coverage under Florida law. Now the restaurant argues that the meaning of the policy is unclear and that physical loss could be stretched to include loss of use from government orders, but we don't think this is true because it would read out of the language of the policy the requirements that the loss be direct or physical. This is the same decision that many courts have made applying very similar rules of policy interpretation, including the ordinary meaning rule, to this policy under the laws of numerous states. Again, our point is that the rules of policy interpretation tend to be fairly consistent across states and many, many states, but we don't think that there's a clear and consistent conclusion about the ordinary meaning of this policy language in this setting. I want to turn briefly to the argument that the coronavirus was on the presence and accepting that that was sufficiently pled. I think that fails to allege either physical loss or damage to the property or that the presence of COVID on this particular restaurant's premises caused its interruption losses. First of all, this court stated in both Gilraeth and Assent Hospitality that it didn't see how the presence of particles would cause physical damage to the property, relying in part on the language of the restoration clause. We think that's the case, but in addition and independently, the restaurant can't show that it's the presence of COVID on its premises that caused its business interruption losses. The losses were caused by the pandemic, which in turn caused the governor's orders, which in turn caused the partial closures of the business. And finally, we don't think that the restaurant argued that it did allege that the coronavirus actually changed the structure of its property. The allegation it cites, which is at the appendix at 35 paragraph 44, won't bear this interpretation. It's simply a claim that the virus was present. So there are no plausible factual allegations that the virus itself physically altered the property. I want to address the exclusions briefly in the Aspen policy. The Bradley Hotel case in the Seventh Circuit, which was decided after we briefed this case, looked at both our loss of use exclusion and our ordinance of law exclusion and held that would have precluded coverage, even if direct physical loss or damage had been alleged here, which they were not. The restaurant argues that interpreting the loss of use provision this way would render the coverage itself meaningless. But as the Seventh Circuit explained, that misunderstands the loss of use exclusion, which only applies when loss of use is untethered to any physical loss or damage to the property. The restaurant also argues that the ordinance or law exclusion doesn't apply because it says the governor's executive orders are not law. Florida law expressly provides that these executive orders have the force and effect of law in statute we've cited to in the brief. And Bradley Hotel, I'd note, rejected this same argument under a very similar Illinois statute. We don't think you need to reach these exclusions, but if you do, we think either of them would independently preclude coverage here. May I assist the court with anything further? I don't hear any questions, Ms. Sykes. We appreciate your argument, especially appreciate you returning some time to us. I just ask then that you affirm the judgment of dismissal below. Thank you. Mr. Burns, you've saved two minutes for rebuttal. Mr. Burns, you were muted. Thank you, Judge Pryor. I want to first address Judge Jordan's question about mass puns. Mass puns is the case, and if you look closely at the case, the court relies on the loss of functionality, and in fact, the elegant massage case relies on mass puns for that principle. The same is true of Azalea. Whether there's damage or not, Azalea's relying on the California loss of functionality case, Hughes, and the Colorado loss of functionality case. I want to briefly address Judge Anderson's question about whether the damages are the cause here. We don't believe that the damages in the cause are the same thing here. The policy requires loss or damage to property that results in a suspension and loss of business income. We would contend that the loss or damage to property is the presence and loss of functionality of the property because of the virus. It resulted in a suspension, which in this policy includes a reduction of her business, which led to a loss of business income. Finally- Let me- I think responsive to what you just said is the defendant's argument that it is not any COVID on the surfaces that caused your suspension of business. It was the close order that caused it, or to the extent COVID itself caused it. It was because of the people coming in, not any effect on property at all. It was the fact that you couldn't have people that close together. Judge Anderson, respectfully, one of the true tragedies of these cases is that causation issues like that, instead of being addressed in the normal course of discovery, experts in trial are just stated as rules of law. The facts may show that it was the closure orders, but having many clients in this space, I know that many of them closed their businesses because of the presence of COVID, not because of closure orders, but these cases haven't been allowed to develop by the courts. I'm sorry, I've gone way over my time in Maurice bonding to you. Apologize to the court. You're okay. You were answering a question from us. That's the last of our arguments this morning. We will be in recess until tomorrow. Thank you, counsel. Thank you.